YAR R. CHAIKOVSKY (SB# 175421)
yarchaikovsky@paulhastings.com
PHILIP OU (SB# 259896)
philipou@paulhastings.com
ANDY LEGOLVAN (SB# 292520)
andylegolvan@paulhastings.com
JOSEPH J. RUMPLER, II (SB# 296941)
josephrumpler@paulhastings.com
BERKELEY FIFE (SB# 325293)
berkeleyfife@paulhastings.com
BORIS LUBARSKY (SB# 324896)
borislubarsky@paulhastings.com
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, California 94304-1106
Telephone: 1(650) 320-1800
Facsimile: 1(650) 320-1900

Attorneys for Plaintiff
APPLIED MATERIALS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| APPLIED MATERIALS, INC., | CASE NO. 5:20-cv-05676-EJD |
|---|---|
| Plaintiff, | **APPLIED MATERIALS, INC.'S OPPOSITION TO DEMARAY LLC'S MOTION TO DISMISS** |
| vs. | |
| DEMARAY LLC, | **Hearing Date: March 4, 2021** |
| Defendant. | **Hearing Time: 9:00 a.m.** |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 3

    A.  Demaray's Customer-Suit Complaints Rely Exclusively on Applied's Reactors and Product Materials to Support Infringement Allegations .................. 3

    B.  Demaray's Customer Suits Created a Reasonable Apprehension of Suit Against Applied ...................................................................................................... 5

    C.  Applied's Declaratory Judgment Action Asserting Non-Infringement based on License ........................................................................................................... 7

    D.  Applied's Declaratory Judgment Action Asserting Non-Infringement based on Assignment Provisions ..................................................................................... 9

III. ARGUMENT ...................................................................................................... 9

    A.  The Court Has Subject Matter Jurisdiction Over Applied's Claims ..................... 9

        1.  Demaray Asserts a Factual Challenge to Jurisdiction Under Rule 12(b)(1)—Thus Requiring Introduction of Extrinsic Evidence ................. 9

        2.  Standard for Assessing Article III "Case or Controversy" ...................... 10

        3.  Demaray's Customer Suits Establish a Reasonable Potential It Could Bring Direct Infringement Claims Against Applied ..................... 11

        4.  Demaray's Customers Suits Also Establish a Reasonable Potential It Could Bring Inducement and Contributory Claims Against Applied ........................................................................................................ 14

        5.  Demaray's Offer to License and Refusal to Covenant Not to Suit Applied Further Weighs in Favor of Finding a Controversy .................. 15

    B.  Enjoining the Customer Suits under the Customer-Suit Rule is the Most Efficient and Convenient Way to Resolve All Actions ......................................... 16

    C.  Demaray's Motion Under Rule 12(b)(6) Should Be Denied ................................ 18

    D.  Applied has Pleaded Sufficient Facts for a Plausible Claim for Relief Based on License ............................................................................................................. 19

    E.  Applied has Pleaded Sufficient Facts for a Plausible Claim for Relief for Non-Infringement based on the Assignment Provisions..................................... 21

        1.  A Finding of Non-Infringement based on the Assignment Provisions in this Action Would Not Restrain Trade or Employee Mobility.................................................................................................... 22

        2.  *Roche* Confirmed that an Assignment Provision that, as Drafted, Could Reach Post-Termination Inventions Is Not Invalid as to Pre-Termination Inventions ...................................................................... 23

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

**TABLE OF CONTENTS**
(continued)

**Page**

       3.    There Is an Open Factual Question as to Whether the Named Inventors Conceived of the Invention During Employment and with Applied's Confidential Information ........................................................... 25

IV.    CONCLUSION ............................................................................................... 25

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co.*
5
 630 F. Supp. 2d 1084 (N.D. Cal. May 20, 2009) ...................................................... 23

6

*Armorlite Lens Co. v. Campbell,*
7
 340 F. Supp. 273 (S.D. Cal. 1972) ............................................................................. 24

8

*Arris Group, Inc. v. British Telecomm. PLC,*
 639 F.3d 1368 (Fed. Cir. 2011) ........................................................................... 13, 14

9

*Bal Seal Eng'g, Inc. v. Nelson Prods.,*
10
 No. 8:13-cv-1880-JLS-KESx, 2016 U.S. Dist. LEXIS 195915 (C.D. Cal. Sep.
 8, 2016) ....................................................................................................................... 15

11

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.,*
12
 583 F.3d 832 (Fed. Cir. 2009) ........................................................................... 22, 24

13

*Bd. of Trs. v. Roche Molecular Sys.,*
14
 487 F. Supp. 2d 1099 (N.D. Cal. 2007) ..................................................................... 24

15

*Demaray v. Intel,*
 No. 6:20-cv-634, Dkt. No. 1-3 .................................................................................... 14

16

*DermaFocus LLC v. Ulthera, Inc.,*
17
 201 F. Supp. 3d 465 (D. Del. 2016) ............................................................................ 14

18

*Dolby Labs., Inc. v. Intertrust Techs. Corp.,*
19
 No. 19-cv-03371-EMC, 2019 U.S. Dist. LEXIS 194022 (N.D. Cal. Nov. 6,
 2019) ........................................................................................................................... 13

20

*Edison v. United States,*
21
 822 F.3d 510 (9th Cir. 2016) ....................................................................................... 10

22

*Hoffmann-La Roche Inc. v. Promega Corp.,*
 No. C-93-1748, 1994 U.S. Dist. LEXIS 10174 (N.D. Cal. June 13, 1994) ............... 15

23

*Kanbar v. O'Melveny & Myers,*
24
 849 F. Supp. 2d 902 (N.D. Cal. 2011) ................................................................... 18, 19

25

*Mass Eng. Des., Inc. v. Planar Sys.,*
26
 426 F. Supp. 3d 680 (D. Or. 2019) ............................................................................. 15

27

*Max Sound Corp. v. Google, Inc.,*
 147 F. Supp. 3d 948 (N.D. Cal. 2015) .................................................................. 10, 13

28

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ........................................................................................................10

*Microsoft Corp. v. DataTern, Inc.*,
    755 F.3d 899 (Fed. Cir. 2014) ..............................................................................11, 13, 14

*Prasco, LLC v. Medicis Pharm. Corp.*,
    537 F.3d 1329 (Fed. Cir. 2008) ......................................................................................13

*Pratt v. Whole Foods Mkt. Cal., Inc.*,
    No. 5:12-cv-05652-EJD, 2014 U.S. Dist. LEXIS 46409 (N.D. Cal. Mar. 31,
    2014) ...............................................................................................................................10

*Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*,
    768 F.3d 938 (9th Cir. 2014) ..........................................................................................19

*Safe Air For Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ..........................................................................................9

*Valley View Health Care, Inc. v. Chapman*,
    992 F. Supp. 2d 1016 (E.D. Cal. 2014) ..........................................................................18

*Whitewater W. Indus. v. Alleshouse*,
    Nos. 2019-1852, 2019-2323, 2020 U.S. App. LEXIS 36394 (Fed. Cir. Nov. 19,
    2020) ....................................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ...........................................................................................................9, 10

Fed. R. Civ. P.  12(b)(6) .............................................................................................................18

1

I.      **INTRODUCTION**

2        Demaray challenges this Court's jurisdiction by arguing that its infringement suits against

3   Applied's customers—which rely **exclusively** on Applied's products, materials, website, and

4   literature—are somehow **not** directed at Applied's products and technology. Demaray's strained

5   arguments, first raised in response to Applied's motion to enjoin Demaray from proceeding in its

6   suits against Applied's customers in the Western District of Texas, were rebutted in reply, including

7   with sworn declarations from Applied, Intel, and Samsung. Undeterred, Demaray attempts to thread

8   this needle again by contending in its motion that Intel and Samsung modify Applied's reactors

9   after Applied manufactures and installs them into an allegedly infringing "configuration" such that

10  the customer suits did not impliedly assert infringement against Applied. But nowhere in the

11  customer complaints does Demaray even allege that such post-installation modifications take place,

12  nor does Demaray produce evidence for its theory.

13       The Applied reactors identified and accused in the customer suits are built by Applied to

14  meet the customers' specific requirements and thereafter installed by Applied at the customers'

15  fabrication facilities. Accordingly, when considering the allegations in the customer complaints in

16  view of Applied's commercial relationship with it customers, there is a reasonable potential that

17  Demaray could bring a claim of infringement against Applied based on the same allegations against

18  Intel and Samsung. Samsung and Intel have denied that their use of Applied's reactors infringe,

19  and likewise, Applied seeks declaratory judgment that it, and its reactors, do not infringe. There is

20  no basis to challenge this Court's jurisdiction over Applied's claims.

21       Likewise, Demaray's 12(b)(6) challenges to the non-infringement claims based on license

22  or assignments should be denied, in particular where disputed facts are viewed in the light most

23  favorable to the nonmoving party.  First, Applied has pleaded that it cannot infringe because the

24  Asserted Patents were licensed as part of a Sales and Relationship Agreement between two

25  sophisticated commercial entities. Demaray overreaches by arguing that this commercial contract

26  is invalid based on § 16600 and that Applied is estopped from arguing otherwise based on the

27  *Advanced* opinion. Demaray is wrong on both. *Advanced* never addressed this commercial contract,

28  let alone the assignment provisions that the parties were aware of and considered as part of their

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

negotiations that led to the agreement. Nor does the holding in *Advance* address the specific facts and issues in this case, where the Federal Circuit has confirmed in both *Whitewater* and *Roche* that an essential threshold question under § 16600 is whether there is "evidence of a restraining effect on [a former employee's] ability to engage in his profession." Demaray does not argue that there has been a restraining effect on Dr. Demaray or any other former employees' ability to engage in their profession—because there is none.

For this reason, § 16600 does not apply to Applied's non-infringement claims based on the assignment provisions of one or more the named inventors either. Unlike in *Advanced* or *Whitewater*, Applied is not seeking to enjoin former employees from competing with Applied, nor is Applied seeking ownership rights in the Asserted Patents; rather Applied is _only_ seeking a declaration that it does not infringe for two independent and distinct reasons: (1) Demaray's predecessor entity granted Applied a license, restricted in scope, that covers the Asserted Patents as part of a commercial contract; and separately (2) Demaray cannot establish ownership over the ownership interest of at least one named inventor. While Demaray may disagree on the merits, it has no basis to argue that Applied has failed to plead a plausible claim for relief that Applied does not infringe for these additional reasons. Demaray's transparent attempt to delay this case from proceeding, while its suits against Applied's customers where the same defenses have been raised, should be denied.[1]

---

[1] Demaray's inconsistent conduct in the customer suits regarding the same license and assignment arguments, raised as affirmative defenses, is telling. Shortly after Intel and Samsung answered Demaray demanded, relying on *Advanced*, that they provide "other support for these defenses" in an amended pleadings or withdraw them, or otherwise "be prepared to meet and confer regarding a motion to strike." Exs. A, B. The customers amended their affirmative defenses to add the same factual allegations as set forth in Applied's FAC, which Demaray presumably recognized as sufficient at the pleading stage as no motion to strike followed. Exs. C, D.

## II.    BACKGROUND

### A.    Demaray's Customer-Suit Complaints Rely Exclusively on Applied's Reactors and Product Materials to Support Infringement Allegations

Demaray filed two actions in the Western District of Texas ("WDTX") against Applied's customers—Intel and Samsung—accusing them of infringing U.S. Patent Nos. 7,544,276 and 7,381,657 (the "Asserted Patents") by using Applied's reactors. *See* Exs. A and B to Applied's First Amended Complaint ("FAC"). Specifically, Demaray accuses Applied's customers of infringing the Asserted Patents by using "RMS reactors" in the "Endura product line from Applied Materials, Inc." to deposit layers into certain semiconductor products. Ex. A to FAC at ¶ 25; Ex. B to FAC at ¶ 28. To support its claims for infringement, Demaray relies exclusively on Applied's products, materials, literature, and website. *See* Ex. A to FAC at ¶ 25 (screenshot of Applied's Endura reactor from Applied's website and citing to various Applied product materials, including an Endura reactor brochure, a journal article written by Applied employees regarding TaN deposition chambers, and an Applied presentation on TiN deposition chambers); *see also id.* at ¶¶ 28, 29, 31, 32, 34, 35, 37, 38, 52, 53, 55, 56, 62, 63, 65, 67; Ex. B to FAC at ¶¶ 28, 31, 32, 34, 35, 37, 38, 40, 41, 54, 55, 57, 58, 61, 62, 64, 65, 67, 69. Indeed, every image in the customer complaints are of Applied's reactors or components thereof, or are images of diagrams and schematics of Applied's reactors and/or are from Applied's website or product materials.

While Demaray's customer-suit complaints make vague allegations of "configurations" to Applied's reactors, those allegations are asserted solely "on information and belief" and either rely exclusively on evidence from Applied (as opposed to Samsung or Intel) or on no evidence whatsoever. *See*, *e.g.*, Ex. A to FAC at ¶¶ 33, 36, 39; Ex. B to FAC at ¶¶ 36, 39, 42 ("On information and belief, [Intel/Samsung] configures, or causes to be configured . . . ."). Demaray makes these "configuration" allegations as to three power supply-related limitations: (1) the "pulsed DC power supply coupled to the target," (2) "an RF bias power supply coupled to the substrate," and (3) "a narrow band-rejection filter that rejects at a frequency of the RF bias power supply coupled between the pulsed DC power supply and the target area." *Id.*

Regarding the first limitation—"pulsed DC power supply coupled to the target"—Demaray

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

relies exclusively on (1) schematics from <u>Applied's product literature</u>, Ex. A to FAC at ¶¶ 34, 35 (first image); Ex. B to FAC at ¶¶ 37, 38 (first image), and (2) an image of an <u>Applied Endura reactor</u>, Ex. A to FAC at ¶ 35 (second image); Ex. B to FAC at ¶ 38 (second image).[2] Regarding the second limitation—"an RF bias power supply coupled to the substrate"—again, Demaray relies exclusively on (1) a schematic from <u>Applied's product literature</u>, Ex. A to FAC at ¶ 37; Ex. B to FAC at ¶ 40, and (2) two images of <u>Applied's reactors</u>.[3] Thus, Demaray's conclusory allegations in its motion that these two power supplies limitations are somehow "configured" by Intel and Samsung are belied by the fact that Demaray relies on <u>Applied's products</u> and <u>Applied's product materials</u>—not Intel's or Samsung's—to support its infringement allegations. Indeed, nowhere in the complaints does Demaray expressly allege that Intel or Samsung takes the Endura reactors, admittedly supplied from Applied, and then replaces either or both power supply with their own. The more reasonable interpretation of Demaray's allegations, based on its citation to literature and images of <u>Applied's reactors</u>, is that <u>Applied</u> provides the power supplies with the reactors that <u>Applied</u> builds and configures for its customers to meet their specific specification requirements (*i.e.,* Intel/Samsung "causes to be configured").

Finally, regarding the third limitation—the "narrow band-rejection filter"—Demaray

---

[2] Demaray did not provide a citation for where it acquired the Endura reactor image at this paragraph; however, a reverse-image search on Google reveals that it came from a third-party website selling a preowned Applied Endura reactor. *See* https://caeonline.com/buy/reactors/amat-applied-materials-endura-ii/9090977.

[3] One of which prominently displays the "Applied Materials" logo in blue next to the red arrow signaling where the "RF power connection to the substrate" is located, Ex. A to FAC at ¶ 38; Ex. B to FAC at ¶ 41. For the other image in this paragraph, Demaray did not provide a citation for where the image was acquired; however, a reverse-image search on Google reveals that it came from a press release on Applied's website relating to Applied's Endura system. *See* https://www.appliedmaterials.com/company/news/press-releases/2015/05/applied-materials-breakthrough-patterning-hardmask-enables-copper-interconnect-scaling.

provides no citation to any evidence whatsoever. Ex. A to FAC at ¶ 40 ("On information and belief, a narrowband filter is used in the Intel RMS reactors as configured to . . . protect the pulsed DC power supply from feedback from the RF bias power supply"); Ex. B to FAC at ¶ 40; *see also* Dkt. No. 23 at 4 ("The narrow band rejection filter allows the power sources to properly function, but prevents damaging feedback to the pulsed DC power source from the RF bias."); *see also* Mot. at 5. In addition to Demaray's failure to provide any factual or evidentiary support that Intel or Samsung "configures" Applied's reactors to add this filter to Applied's reactors, these same arguments were already rebutted in Applied's reply brief in support of its injunction motion. *See* Dkt. No. 26-12 at ¶¶ 15–16; Dkt. No. 26-8 at ¶¶ 10–11; Dkt. No. 26-10 at ¶ 12.

**B.    Demaray's Customer Suits Created a Reasonable Apprehension of Suit Against Applied**

Upon reviewing Demaray's customer suits against Intel and Samsung, Applied immediately recognized that Demaray was, in effect, implicitly asserting infringement allegations against Applied and Applied's reactors. *See* Forster Decl. ¶¶ 2–10. This is because customers like Intel and Samsung typically provide Applied with a set of specifications for a type of film they would like to deposit, and based on those specifications, Applied manufactures the RMS reactors to deposit films according to the customers' specifications. *Id*. at ¶ 6. The Endura system, and systems like it, are not simply purchased "off the shelf," but rather are manufactured by Applied to meet the specifications requested by Intel and Samsung. *Id*. at ¶ 5. Performing post-installation modifications—such as modifying the power supply or adding an additional component, *e.g.* a filter— to the system as installed by Applied, could cause the reactor to no longer meet the customers' required specifications or impact its warranty. *Id* at ¶ 6.

At the time Applied filed its declaratory judgment complaint, Applied reasonably interpreted Demaray's allegations in the customer complaints as implied assertions of infringement against Applied. Notably, Demaray's motion entirely ignores that Applied manufactures, assembles, and installs the accused Endura reactor systems at Intel's and Samsung's respective fabrication facilities; which requires a complex precision and planning process between Applied and its respective customer. If Demaray was not aware of this process before it sued Intel and

Samsung,[4] Demaray was certainly aware of before it filed the instant motion. *See* Dkt. Nos. 28-6–12. Demaray, nevertheless, disregards this reality in bringing its motion.

Demaray does not allege (or substantiate in any way) that, after Applied manufactured and installed its systems, Intel or Samsung subsequently—on their own—perform unauthorized post-installation hardware modifications, such as switching out a continuous DC power supply for a pulsed DC power supply. Applied is not aware of any of its customers performing such configurations. Forster Decl. ¶ 6. This strained and illogical theory, first introduced in this motion, was not pleaded, or substantiated, in the customer-suit complaints.

In sum, based on the allegations in Demaray's customer complaints and the reality of Applied's commercial relationships with its customers, Applied immediately recognized that, despite any conclusory allegations that Intel and Samsung purportedly "configures, or causes to be configured" the reactors, Demaray was effectively accusing Applied and Applied's reactors of infringing the Asserted Patents. *See* Forster Decl. at ¶¶ 9–10. Because Demaray's customer suits against Intel and Samsung implicitly accused Applied of infringement, Applied promptly filed the instant action for a judgment declaring that Applied does not directly or indirectly infringe the Asserted Patents. *See* Dkt. No. 1 at ¶¶ 16–18, 21–23; Dkt. No. 13 at ¶¶ 45–52.

In October 2020, Demaray served its Preliminary Infringement Contentions in the customer suits against Intel and Samsung. Demaray has maintained that the contentions, including even its selection of dependent claims to assert, are confidential and refused to produce them to Applied. A "public" version that is limited to claim 1 of each Asserted Patent has since been made available (*see* Exs. E and F), which further confirm what Applied reasonably, believed based on Demaray's customer-suit complaints, that: Demaray's infringement actions were, in reality, accusing Applied and Applied's reactors of infringing the Asserted Patents. Specifically, Demaray cites <u>exclusively</u>

---

[4] Any purported ignorance by Demaray about how a supplier like Applied would build, configure, and install PVD reactors for its customers is not credible considering Dr. Demaray's "more than fifty years" working in the semiconductor industry, including previously as General Manager of Applied Komatsu's PVD division. Dkt. No. 23-1 at ¶¶ 2, 4.

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

to Applied's reactors and Applied's product materials to support infringement contentions. Indeed, every image, diagram, and schematic for the infringement contentions of claim 1 of the '276 patent is of Applied's products and/or come from Applied's product materials. Those contentions, like the customer complaints, are devoid of any allegations that the customers make post-installment hardware modifications to the accused reactors supplied by Applied.[5]  As with the allegations in the customer-suit complaints, Demaray's allegations are belied by the fact that Demaray consistently and repeatedly cites to Applied's products and Applied's product materials—not Intel or Samsung's—to support infringement contentions. *Id.*

**C.     Applied's Declaratory Judgment Action Asserting Non-Infringement based on License**

After Applied filed its initial Complaint for declaratory relief, Applied filed a First Amended Complaint to add an additional non-infringement claim based on a license. Specifically, Applied seeks a declaratory judgment that it does not infringe because Applied holds a license to the Asserted Patents based on an agreement between Applied's affiliate (Applied Komatsu) and Demaray's predecessor company (Symmorphix). FAC at ¶¶ 53–64.

In 1998, Dr. Demaray, along with several colleagues from Applied and Applied Komatsu, left to form a new company: Symmorphix. The former employees would continue working on the

---

[5] Demaray continues to contradict its statements and arguments made to this Court through its conduct in the customer suits.  In support of its motion, Demaray argued "[t]here is no allegation in the Texas complaints that the Demaray patents cover all PVD reactor configurations" Mot. at 5 citing to Dr. Demaray's declaration at ¶ 12.  Demaray has repeatedly stressed its allegations are directed to **"specific configurations"**.  *Id* at 2; *see also* Dkt. No. 23 at 4:22–5:3 and 6:4–9; Dkt. No. 40 at 5:10–23.  In turn, Demaray previously agreed to narrow the scope of requested venue discovery in the customer suits from "all RMS-PVD reactors" to only ones having the "specific configuration" of providing (1) pulsed DC power to the target and (2) RF bias to substrate, as required by the Asserted Patents.  Ex. I.  Yet on Dec. 7, Demaray reversed course, serving venue discovery requests that seek information on all RMS-PVD reactors, not limited by any "specific configuration" whatsoever.  Exs. J at 2, K at 2 (defining Samsung/Intel RMS-PVD chamber).

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

same technology they worked on at Applied and Applied Komatsu, including sputtered silicon deposition technology. *Id.* at ¶¶ 15–16. In support of the former employees' continued work in this area, Applied Komatsu and Symmorphix executed a Sale and Relationship Agreement ("SRA") on December 11, 1998, under which Symmorphix would continue using Applied Komatsu facilities and purchase two Applied Komatsu systems. Pursuant to the SRA, Symmorphix continued using the Applied Komatsu facilities and equipment until at least the Fall of 1999. Ex. G at 14–15. As part of the SRA, Symmorphix granted Applied a license to "any rights of Symmorphix under any patents issued based on any patent applications filed before January 1, 2001, for inventions, improvements, or enhancements developed by Symmorphix relating to sputtered silicon deposition technology, provided that AKTA shall not utilize such rights to pursue the same product objectives concerning flat panel displays as Symmorphix." Ex. G at 9. Dr. Demaray admitted that "[a]s part of the agreement, Applied Komatsu agreed to release me and the other former employees joining Symmorphix from assignment provisions in certain employment agreements." Dkt. No. 23-1 at ¶ 6. The release provision (paragraph 4 of Exhibit C) follows the "License Grants" set forth in Exhibit C of the SRA. *See* Ex. G at 9.

In early 1999, Symmorphix contacted Applied Komatsu to renegotiate the license provision in the SRA. Ex. H. Specifically, Symmorphix expressed concern that the license provision "may allow [Applied Komatsu] . . . to compete with Symmorphix." *Id.* at 1. At Symmorphix's behest, Applied Komatsu renegotiated the license provision and on January 29, 1999, entered into an amendment to the SRA. The parties agreed that, "provided that [Applied Komatsu] shall not utilize such rights to pursue a business of providing [sputtering silicon deposition services]," Symmorphix grants Applied Komatsu a perpetual, royalty-free license to "inventions, improvements, or enhancements developed by Symmorphix relating to sputtered silicon deposition technology"—the technology embodied in the Asserted Patents. Ex. G at 11. The amendment to the license grant of the SRA broadened the non-compete condition to "provided that AKTA shall not utilize such rights to pursue a business of providing Services" where "Services" is defined as "providing sputtered silicon deposition services." *Id.* The amendment also removed the temporal limitation of "before January 1, 2001," but limited the grant to inventions conceived of by former Applied or Applied

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

Komatsu personnel who subsequently joined Symmorphix, such as Dr. Demaray, as opposed to any Symmorphix employee.

Symmorphix and Applied Komatsu were two sophisticated commercial entities that negotiated an arms' length commercial contract granting Applied Komatsu a license to Symmorphix patents, and preventing Applied Komatsu from competing with Symmorphix. The license grant expressly permitted Applied Komatsu to transfer or assign such license grant to Applied, and expressly allowed Applied Komatsu's customers to use such inventions as well. FAC at ¶ 19. Therefore, Applied separately seeks a declaration it does not infringe because Applied holds a license to the Asserted Patents by virtue of the SRA.

### D. Applied's Declaratory Judgment Action Asserting Non-Infringement based on Assignment Provisions

Applied's First Amended Complaint also added a non-infringement claim based on Demaray's inability to establish complete ownership over the Asserted Patents. Specifically, Applied seeks a declaratory judgment that Applied cannot infringe because Symmorphix never had the assignment rights of named inventor, Mukundan Narasimhan. Importantly, Applied is <u>not</u> making a declaratory judgement claim that it has an ownership interest in the Asserted Patents; rather, Applied is seeking a declaration that Demaray cannot establish ownership over Mr. Narasimhan's interest and therefore cannot bring an infringement claim. FAC at ¶¶ 53–64.

Under the provisions of Mr. Narasimhan's employee agreement with Applied, Mr. Narasimhan's ownership rights in the Asserted Patents' parent application were automatically assigned to Applied. *Id.* at ¶¶ 29–33. That defect in the chain of title precludes Demaray from asserting infringement. Therefore, Applied separately seeks a declaration that Applied's products cannot infringe the Asserted Patents because Demaray cannot establish ownership over Narasimhan's interest and therefore cannot bring an infringement claim. FAC at ¶¶ 53–64.

## III.  <u>ARGUMENT</u>

### A. The Court Has Subject Matter Jurisdiction Over Applied's Claims

#### 1. Demaray Asserts a Factual Challenge to Jurisdiction Under Rule 12(b)(1)—Thus Requiring Introduction of Extrinsic Evidence

A jurisdictional challenge under Rule 12(b)(1) can be either facial or factual. *Safe Air For*

*Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "A facial 12(b)(1) motion involves an inquiry confined to the allegations in the complaint, whereas a factual 12(b)(1) motion permits the court to look beyond the complaint to extrinsic evidence." *Pratt v. Whole Foods Mkt. Cal., Inc.*, No. 5:12-cv-05652-EJD, 2014 U.S. Dist. LEXIS 46409, at \*6–7 (N.D. Cal. Mar. 31, 2014) (citing *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004)).

Where "'the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction,'" as is the case here, "'the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction.'" *Max Sound Corp. v. Google, Inc.*, 147 F. Supp. 3d 948, 952 (N.D. Cal. 2015) (quoting *Cedars-Sinai Medical Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993)). "On a factual challenge, the party opposing the motion must produce affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Pratt*, 2014 U.S. Dist. LEXIS 46409, at \*6–7 (citing *Safe Air For Everyone*, 373 F.3d at 1039). "In the absence of a full-fledged evidentiary hearing, however, disputed facts pertinent to subject matter jurisdiction are viewed in the light most favorable to the nonmoving party." *Id*. (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996)); *see also Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) ("Any factual disputes . . . must be resolved in favor of [p]laintiffs.").

Here, Demaray's Motion asserts a <u>factual</u> challenge to jurisdiction (not a facial one) because it attempts to controvert Applied's allegations that Demaray's customer suits against Intel and Samsung implicitly accuse Applied and Applied's reactors of infringing the Asserted Patents. To that end, Demaray relies on extrinsic evidence, including the Declaration of its principal, Dr. Demaray, in an attempt to show that Demaray's customer suits purportedly do not establish an implied assertion of infringement against Applied. *See* Mot. at 5, 7–8. Demaray's factual attack therefore requires resort to extrinsic evidence.

### 2.      Standard for Assessing Article III "Case or Controversy"

The threshold question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). If a supplier's declaratory judgment

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

jurisdiction is based on a patentee's suit against a customer, the requirements are met if the customer suit includes an "implied assertion" of infringement against the supplier. *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 903 (Fed. Cir. 2014). All that is required are "allegations by the patentee or other record evidence" in the customer suit establishing "a reasonable potential" a claim against the supplier could be brought. *Id*. at 904.

### 3. Demaray's Customer Suits Establish a Reasonable Potential It Could Bring Direct Infringement Claims Against Applied

Demaray's ***exclusive*** identification of Applied's Endura reactors and reliance on Applied's product materials, website, and literature in its customer-suit complaints create an implied assertion of infringement against Applied and establish a reasonable potential that Demaray could bring direct infringement claims against Applied based on those same allegations. *See* Ex. A to FAC at ¶¶ 25, 28, 29, 31, 32, 34, 35, 37, 38, 52, 53, 55, 56, 62, 63, 65, 67; Ex. B to FAC at ¶¶ 28, 31, 32, 34, 35, 37, 38, 40, 41, 54, 55, 57, 58, 61, 62, 64, 65, 67, 69. Although Demaray contends in its Motion that its claims relating to the '276 patent are based on alleged "configurations" made by Intel and Samsung to Applied's reactors, Mot. at 2, Demaray points exclusively to Applied system features and configurations—not Intel or Samsung—to support its infringement contentions. *See* Ex. A to FAC at ¶¶ 34, 35, 37, 38; Ex. B to FAC at ¶¶ 37, 38, 40, 41. On these grounds alone, Demaray's allegations establish a reasonable potential that it could assert that Applied's reactors, by themselves, satisfy these claim limitations, and therefore could bring an infringement claim against Applied.

In an attempt to overcome this inescapable conclusion, Demaray points to the only claim limitation for which Demaray did not cite to Applied's products or product materials in the customer suits: "a narrow band-rejection filter that rejects at a frequency of the RF bias power supply coupled between the pulsed DC power supply and the target area." *See* Mot. at 5. However, this allegation is asserted "on information and belief" and includes no factual or evidentiary support of its argument that Intel and Samsung modify—on their own—the Applied reactor after installation to include this feature. Ex. A to FAC at ¶¶ 39–40; Ex. B to FAC at ¶¶ 42–42. Demaray's theory is further undermined by its later-served infringement contentions against Intel and Samsung

which, like the customer complaints, cite no evidence whatsoever for this limitation, let alone make an allegation of post-installation modifications by Intel or Samsung to add the narrow band-rejection filter to the Applied reactor system. Ex. E at 13; Ex. F at 13.

Recognizing the deficiencies in its customer complaints and infringement contentions, Demaray now claims it relied on "reverse engineering" of Intel and Samsung's products, which allegedly "suggest[s] Intel's and Samsung's use of the infringing reactor configurations." Mot. at 5. First, the customer complaints make no reference to "reverse engineering" nor do Demaray's later issued infringement contentions. Next, putting aside that this is only an attorney representation without any admissible evidence (and therefore should be disregarded), it is unclear how the purported "reverse engineering" analysis of the end product made with a reactor can conclude that configuration of the reactor was performed by one entity over another (*i.e.*, by Intel or Samsung, as opposed to Applied), or specifically that Intel and Samsung add a narrow-band rejection filter on their own to the Applied reactor post-installation. Forster Decl. at ¶¶ 7-8. Indeed, nowhere in the customer-suit complaints does Demaray allege that Intel and Samsung buy an Applied reactor and then, on their own, perform post-installation modifications to "configure" the reactor in a manner that would allegedly infringe. Regardless, Demaray has made no attempt to substantiate this point, aside from a vague and conclusory attorney argument, unsupported by facts or evidence.

The reality is that for each Endura system Applied has manufactured and sold to Intel or Samsung, Applied manufactures the system, assembles it, and installs it at the customers' fabrication facilities through a complex process requiring precision and planning between Applied and its respective customer. *See* Dkt. No. 26-14 at ¶ 4. Applied has no reason to believe that Intel or Samsung modifies, replaces, or adds additional hardware components to the power supply or any other aspect of the Endura system Demaray alleges Intel and Samsung "configure." Forster Decl. at ¶ 6. As discussed, such unauthorized modifications could cause the system to no longer meet the customers' desired specifications that the system was designed and built to meet, as well as fall outside of Applied's warranty, which would presumably be undesirable for Intel and Samsung. *Id*.  Demaray's strained theory is both unsupported and disconnected from the evidence already disclosed to Demaray in Applied's briefing in support of its preliminary injunction. *See*

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

Dkt. No. 26-12 at ¶¶ 15–16; Dkt. No. 26-8 at ¶¶ 10–11; Dkt. No. 26-10 at ¶ 12.[6] Thus, when Demaray alleges in the customer-suit complaints that Intel and Samsung infringe the Asserted Patents by using Applied's "configured" reactors, Demaray is necessarily implicitly alleging that Applied and Applied's reactors, by themselves, infringe the Asserted Patents—and therefore, Demaray's customer suits establish a "reasonable potential" that an infringement claim could be brought against Applied. *See DataTern, Inc.*, 755 F.3d at 904.

Considering the exclusive focus on Applied's products and materials in Demaray's complaints against Applied's customers, a controversy exists because there is a reasonable potential Demaray could bring direct infringement claims against Applied. The potential for such claims will continue until the controversy is resolved, and this Court has jurisdiction to resolve Applied's declaratory relief claim that it does not directly infringe the Asserted Patents through its manufacture, sale, and/or use (*e.g.,* by testing) of Applied's Endura reactors.[7]

---

[6] While the Intel, Samsung, and Applied declarations were submitted to the Court after filing Applied's operative FAC, the facts contained in those declarations, including the commercial relationship between Applied and its customers, existed at the time the FAC was filed. In other words, these are not "later events" to establish "jurisdiction where none existed at the time of filing," *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008), but rather extrinsic evidence to substantiate the jurisdictional allegations in Applied's FAC, as is proper under the factual jurisdictional challenge that Demaray has brought, *see Max Sound Corp.*, 147 F. Supp. 3d at 952 ("Since the 'facts underlying the controverted jurisdictional allegations are in dispute,' the court 'is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings.'") (quoting *Cedars-Sinai Medical Ctr.*, 11 F.3d at 1583).

[7] Demaray asserts that Applied's allegation that it <u>does not</u> infringe the Asserted Patents somehow proves there is no controversy. *See* Mot. at 6. The law does not require an admission of liability before a party has standing to contest a claim. No legal principles prevent Applied from bringing a declaratory action for non-infringement while also denying that it infringes the Asserted Patents. *See Arris Group, Inc. v. British Telecomm. PLC*, 639 F.3d 1368, 1380 (Fed. Cir. 2011); *Dolby*

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

4.      **Demaray's Customers Suits Also Establish a Reasonable Potential It Could Bring Inducement and Contributory Claims Against Applied**

Separately, the factual allegations in Demaray's customer-suit complaints establish a reasonable potential that Demaray could bring claims of indirect infringement against Applied for "provid[ing] its customers with the necessary components to infringe the [Asserted Patents] as well as the instruction manuals for using the components in an infringing manner." *DataTern*, 755 F.3d at 905; *DermaFocus LLC v. Ulthera, Inc.*, 201 F. Supp. 3d 465, 471 (D. Del. 2016).

Demaray alleges that Applied provides its customers with certain "application-specific process kits" that allow them to "modif[y]" the reactors to fit their needs. Ex. A to FAC at ¶ 25. Further, one of the Applied Endura product materials relied on by Demaray and attached to the customer-suit complaints describes (1) "[f]lexible system configuration" to "configure and run various chamber types, gases, and system hardware," (2) "all process control parameters within the system can be tailored to user's specific requirements within system limits," and (3) "parameters" include "DC power," "DC bias," and "voltage." *Demaray v. Intel*, No. 6:20-cv-634, Dkt. No. 1-3 at p. 8 of 9. Demaray could therefore potentially allege the various Applied product materials in Demaray's complaints provide circumstantial evidence of the necessary *mens rea* to support an induced infringement claim: that Applied encourages the configuration of its reactors in allegedly infringing ways, including as it relates to the power supply-related configurations.

Likewise, there is a reasonable potential that Demaray could allege contributory infringement against Applied: by supplying an apparatus for use in practicing a patented process that is not a staple article of commerce suitable for substantial non-infringing use. First, Demaray relies extensively on Applied's Endura reactors and Applied's product materials, website, and literature to support its customer allegations of infringement. *See Arris*, 639 F.3d at 1378 ("[Patentee's] extensive focus on Arris' [] products in its infringement contentions implies that Arris' products are being used as a 'material part' of the allegedly infringed invention[.]").

Second Demaray sued two of the world's biggest chipmakers, both of which have been

_____

*Labs., Inc. v. Intertrust Techs. Corp.*, No. 19-cv-03371-EMC, 2019 U.S. Dist. LEXIS 194022, at *18 (N.D. Cal. Nov. 6, 2019).

1    publicly described as Applied's "biggest" and "main customers." *See* Dkt. Nos. 27-3, 27-4. The

2    target of Demaray's accusations (using Applied's flexible configurations) demonstrates that any

3    alleged non-infringing uses of Applied's products outside the way the products are used by

4    Applied's biggest customers are not intended uses (if they are used at all). Therefore, Demaray's

5    allegations establish a reasonable potential Demaray could assert that the allegedly infringing

6    configurations and methods are the primary and substantial use, and that any non-infringing

7    configurations are "occasional" at best. *See Mass Eng. Des., Inc. v. Planar Sys.*, 426 F. Supp. 3d

8    680, 690–91 (D. Or. 2019). Further, according to Demaray, such non-infringing use results in

9    damage to the power supply and prevents it from functioning properly, Ex. A to FAC at ¶ 40; Opp.

10   at 4, a result Applied would presumably avoid based on Demaray's claims. *See Hoffmann-La Roche*

11   *Inc. v. Promega Corp.*, No. C-93-1748, 1994 U.S. Dist. LEXIS 10174, at *30 (N.D. Cal. June 13,

12   1994) (non-infringing use is not "substantial" if it is not "commercially viable").

13        In sum, this Court has jurisdiction because Demaray's customer suits establish a reasonable

14   potential that Demaray could assert direct and indirect infringement against Applied.

15           **5.    Demaray's Offer to License and Refusal to Covenant Not to Suit**
                     **Applied Further Weighs in Favor of Finding a Controversy**

16

17        As described herein, the allegations in the customer suits, by themselves, establish a

18   controversy sufficient to confer jurisdiction in this Court. The other circumstances—such as (1)

19   Demaray's offer to license the Asserted Patents, Dkt. No. 27-2, (2) Demaray's inexplicable

20   assertion to the Court that it never made such an offer, Dkt. No. 26-4 at 2, (3) Demaray's continuing

21   refusal to covenant not to sue Applied despite its repeated assertion that (for the purposes of

22   challenging subject matter jurisdiction) it is not accusing Applied's reactors of infringement, Dkt.

23   No. 40 at 3, and (4) Demaray's assertion that it may bring infringement counterclaims against

24   Applied in this action, *id*. at 6—while not necessarily sufficient by themselves to establish a

25   controversy, they are considered under the "all the circumstances" test established by the Supreme

26   Court. *See, e.g.*, *Bal Seal Eng'g, Inc. v. Nelson Prods.*, No. 8:13-cv-1880-JLS-KESx, 2016 U.S.

27   Dist. LEXIS 195915, at *11–12 (C.D. Cal. Sep. 8, 2016) ("[A] refusal to provide [a covenant not

28   to sue] . . . adds more weight to the existence of an actual controversy.") (quoting *MedImmune*, 549

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

1    U.S. at 127).

2      While Demaray previously asserted that it had "never approached Applied about licensing"

3    the Asserted Patents, *See* Dkt. No. 23 at 5, Demaray now concedes that it did in fact make such an

4    offer, *see* Mot. at 9–10. (To date, Demaray has not offered an explanation for why it asserted that

5    this offer was never made.) While it is true that Demaray's offer to license did not carry with it an

6    express threat of infringement, the implication from making such an offer is that the offeree is

7    practicing (or may in the future practice) the patented invention—otherwise there is no reason to

8    make such an offer. Dr. Demaray, as a former Applied Komatsu employee, knows Applied's

9    technology and in fact worked on similar technology at Applied Komatsu, which makes such an

10   offer more than a "bazaar merchant showing off his wares," Mot. at 10, and instead carries with it

11   the implied representation that Applied *may need* the patent rights being offered. Of course, the

12   license offer, by itself, is not sufficient to establish jurisdiction, but the fact that Demaray then

13   subsequently sued Applied's customers for infringing the Asserted Patents based exclusively on

14   Applied's products and Applied's product materials puts an allegedly innocuous license offer into

15   a more threatening context.

16     Finally, providing further context to the circumstances, after Demaray offered the license

17   to Applied and subsequently sued Applied's customers for infringement, to date, Demaray has

18   refused to either offer Applied a covenant not to sue or to otherwise make a decision as to whether

19   it will file compulsory counterclaims for infringement against Applied in this action. *See* Dkt. No.

20   40 at 3, 6. Demaray's purported indecision reinforces that Applied correctly viewed Demaray's

21   customer suits as an "implied assertion" of infringement against Applied, such that there was a

22   "reasonable potential" a claim against the Applied could be brought.

23     **B. Enjoining the Customer Suits under the Customer-Suit Rule is the Most**
     **Efficient and Convenient Way to Resolve All Actions**

24     Demaray argues that once the Court finds jurisdiction is proper it should subsequently

25   decline jurisdiction purportedly because it would be more convenient and efficient for the two

26   customer suits to proceed in lieu of this action. Mot. at 10–11. Nothing could be further from the

27   truth. As explained in Applied's Motion for Preliminary Injunction, resolution of this action will

28

prove dispositive of the majority—if not all—of the issues in the customer suits, including by resolution of Applied's technical non-infringement claims, non-infringement claim based on a license, or non-infringement claim based on assignments. *See* Dkt. Nos. 14, 26-4. The products at issue—Applied's Endura reactors—were designed and developed by Applied, and the license and assignment agreements were negotiated and performed by Applied and its employees. It is vastly more efficient for Applied to litigate these personal claims as a party, rather than Intel and Samsung doing so with Applied as a third party, given that Applied (not Intel or Samsung) has possession and control over the documents and witnesses necessary to litigate these claims.

The cases Demaray cites to argue the Court should decline jurisdiction are inapposite. For example, in *Proofpoint, Inc. v. InNova Patent Licensing, LLC*, the court declined jurisdiction based on a variety of factors not present here. First, the court found that the first-to-file rule did not provide a clear answer as to which action should take precedence and the court found that the customer-suit exception did not apply because "Proofpoint was not the only supplier of allegedly infringing technology." No. 5:11-cv-02288-LHK, 2011 U.S. Dist. LEXIS 120343, at *18–19, n.5 (N.D. Cal. Oct. 17, 2011). Conversely, here, this action takes precedence under the customer-suit rule, in part, because Applied is the *only supplier* of allegedly infringing reactors identified in Demaray's customer suits. Dkt. No. 14 at 4, n.1; Dkt. No. 26-4 at 8–9.

Second, the *Proofpoint* court also found that the interests of judicial economy warranted declining jurisdiction because the Texas action had been pending for nearly a year before the declaration judgment action was filed, a claim construction ruling was pending in the Texas action, and the Texas court had already invested "considerable energy" in the action. 2011 U.S. Dist. LEXIS 120343, at *19–20. Here, to the contrary, this action and the customer suits were filed at approximately the same time and the WDTX court has not taken any substantive action in the customer suits.[8] Finally, the *Proofpoint* court noted that the plaintiff did not dispute that Texas was

---

[8] Demaray mischaracterizes the WDTX proceedings by claiming that Intel and Samsung requested a stay of the customer suits. Mot. at 11. Intel and Samsung did not request a stay, but rather asked the WDTX court to defer issuing a scheduling order in light of the then-upcoming preliminary

a convenient forum. *Id.* at 22. Here, Applied has clearly asserted that WDTX is in inconvenient forum for all parties, as there neither this action nor the parties has any relevant connection to WDTX; rather, all relevant witnesses and evidence are located in or around NDCA. *See* Dkt. No. 14 at 17–18; Dkt. No. 26-4 at 13–15. In sum, far from warranting dismissal of this action, the comparative efficiency and comparative convenience between this action and the customer suit significantly weighs in favor of this Court assuming jurisdiction and temporarily enjoining the customer suits during the pendency of this action.

### C.      Demaray's Motion Under Rule 12(b)(6) Should Be Denied

As an initial matter, Demaray's argument that Applied is estopped from asserting the validity of the license and assignment provisions is fundamentally flawed, *see* Mot. at 13 (citing *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co.* 630 F. Supp. 2d 1084 (N.D. Cal. 2009)). In particular, collateral estoppel does not apply (1) when the facts underlying the earlier judgment are materially different than those in the subsequent action, or (2) when there is an intervening change in the applicable legal context. *Kanbar v. O'Melveny & Myers*, 849 F. Supp. 2d 902, 908–09 (N.D. Cal. 2011); *see also Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1047 (E.D. Cal. 2014).

As explained in detail below, the facts of this case and those in *Advanced* are drastically different, as was the existing legal precedent regarding § 16600 when *Advanced* was decided. First, unlike in *Advanced*, this action involves not just assignment agreements, but also a subsequent license provision included in a broader, more complex, commercial contract that was negotiated at arms' length by sophisticated commercial entities: Symmorphix and Applied Komatsu. Demaray erroneously frames the license provision as being contingent on whether the assignment provisions

---

injunction hearing before this Court. The court ultimately entered a scheduling order pursuant to the court's ordinary practice—and, importantly, made no findings or ruling on the question of whether Applied's action in this Court or the customer suits in WDTX should take precedence under the "customer suit" rule. This is the second time Demaray has mischaracterized these proceedings. *See* Dkt. Nos. 32, 34.

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

of the inventors are valid and enforceable, and then further overreaches by suggesting that *Advanced* prevents Applied from asserting its license rights; but *Advanced* had nothing to do with the Sales and Relationship Agreement's license provision, let alone decide that the license provision of that Agreement was invalid or unenforceable.

Second, unlike in *Advanced*, here Applied is not seeking to enjoin former employees from competing with Applied, nor is Applied seeking ownership rights in the Asserted Patents; rather, Applied is *only* seeking a declaration that it does not infringe the Asserted Patents for two independent and distinct reasons: (1) Demaray's predecessor entity, Symmorphix, granted Applied a restricted license that covers the Asserted Patents as part of a Sales and Relationship Agreement; and separately, (2) that Demaray cannot establish ownership over the ownership interest of at least one named inventor.

Thus, enforcement of the assignment provisions in this action will not implicate any restraint-of-trade or employee-mobility concerns. Indeed, Federal Circuit precedent applying § 16600 since *Advanced* was decided has confirmed that evidence of a "restraining effect" on the former employee's "ability to engage in his profession" is "a threshold ground for application of § 16600." *Whitewater W. Indus. v. Alleshouse*, Nos. 2019-1852, 2019-2323, 2020 U.S. App. LEXIS 36394, at *25–26 (Fed. Cir. Nov. 19, 2020) (citing *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 845 (Fed. Cir. 2009)). Given the materially different factual and legal landscape before the *Advanced* court and this Court, collateral estoppel does not apply— thus, permitting the Court to address the merits. *See Kanbar*, 849 F. Supp. 2d at 909 ("Accordingly, because there has been a change in the law and the issues are not identical . . . collateral estoppel does not apply. The Court thus turns to the merits of the arguments[.]").

## D. Applied has Pleaded Sufficient Facts for a Plausible Claim for Relief Based on License

Drawing all reasonable inferences in favor of Applied, *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014), Applied has pleaded a plausible claim for relief that Applied does not infringe the Asserted Patents based on the license between Symmorphix and Applied Komatsu.

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

Symmorphix and Applied Komatsu were two sophisticated commercial entities that negotiated an arms' length agreement which, among other terms, granted Applied Komatsu a license to certain Symmorphix patents, prevented Applied Komatsu from competing with Symmorphix, and released Dr. Demaray and the other former Applied Komatsu employees who joined Symmorphix of their assignment obligations. The Federal Circuit in *Whitewater* confirmed that, when there is no restraining effect on former employees, for the purposes of § 16600, commercial contracts between businesses are assessed under the less restrictive "reasonableness" standard. *Whitewater*, 2020 U.S. App. LEXIS 36394, *19 (citing *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1152, 1159 (2020) ("In sum, a survey of our precedent construing section 16600 and its predecessor statute reveals that we have long applied a reasonableness standard to contractual restraints on business operations and commercial dealings.")).

Symmorphix bargained for, among other things, a non-compete provision from Applied Komatsu in exchange for a limited license grant to the Asserted Patents. Ex. H at 1. The license provision had no restraining effect on former Applied Komatsu employees, and was in fact, negotiated expressly to disclaim Applied Komatsu's ownership to post-termination inventions. *Id.* Therefore, under the Federal Circuit's rule-of-reason analysis, because enforcement of the license would have no restraining effect on any former employee, the license is valid under § 16660.

Here, there is no post-employment impairment of any former employee's ability to engage in their profession or trade by reason of the license. The SRA between Applied Komatsu and Symmorphix was a commercial contract between two sophisticated commercial entities that was negotiated at arms' length and therefore under *Ixchel* is properly assessed and confirmed as valid under the rule of reason standard. In fact, Symmorphix specifically requested that the SRA be amended to broaden the scope of Applied's agreement to not use its license to Symmorphix's intellectual property to compete with Symmorphix. *See supra* Section II.C.; Ex. H ("I received the attached memo from Corning last Friday requesting clarifications to Exhibit C of our agreement. Corning's major concern is that paragraph 3b) may be broader than intended and may allow AKT to use Symmorphix's patents to compete with Symmorphix in flat panel displays. . . . I suggest that paragraph 3b) be revised to restrict the license of Symmorphix' patents back to AKTA (and

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

1   AKTA's parents) for use on silicon wafers for semiconductors."). The amendment broadened the

2   non-compete condition to "provided that AKTA shall not utilize such rights to pursue a business

3   of providing Services" where "Services" is defined as "providing sputtered silicon deposition

4   services." Ex. G at 12. The amendment also removed the temporal limitation of "before January 1,

5   2001," but limited the grant to inventions that (but for the release) would have been required by

6   "existing AKTA Employee Agreements with any Symmorphix personnel"—*i.e.,* inventions of only

7   the former Applied Komatsu employees, such as Dr. Demaray, and not all Symmorphix personnel,

8   including those who did not have assignment agreements with Applied.

9          Demaray provides no basis whatsoever for declaring the license between Applied Komatsu

10  and Symmorphix invalid under the applicable precedent. Rather, citing to the preamble language

11  to the license grant, Demaray asserts a strained argument that the license is somehow dependent on

12  the validity of the assignment provisions. *See* Mot. at 13 ("[t]o the extent required by existing

13  [Applied Komatsu] Employee Agreements with any Symmorphix personnel . . . ."). Not so. The

14  purpose of this preamble language was not to add some purported condition precedent that the

15  assignment provisions must be valid before the license is effective—to the contrary, both parties

16  undisputedly assumed the assignments were valid and relied on that fact in good faith in re-

17  negotiating Exhibit C to the SRA. Both Symmorphix and Applied Komatsu knew that former

18  Applied Komatsu employees had assignment provisions in their employee agreements—and

19  Symmorphix bargained for a non-compete from Applied Komatsu and in exchange granted Applied

20  Komatsu a license to the Asserted Patents. Indeed, Demaray admits that as part of the SRA, Applied

21  Komatsu agreed to release him and the other former employees from the assignment provisions in

22  their employment agreements. Dkt. No. 23-1 ¶ 6. In sum, there is no basis in law or fact to claim

23  that the license grant is somehow dependent on the validity of the employee agreements assignment

24  clause, particularly where there is no plausible claim that enforcement of the license grant would

25  impair any rights of the former employees or otherwise constitute a restraint of trade under § 16600.

26      **E.    Applied has Pleaded Sufficient Facts for a Plausible Claim for Relief for Non-Infringement based on the Assignment Provisions**

27

28

1.   **A Finding of Non-Infringement based on the Assignment Provisions in this Action Would Not Restrain Trade or Employee Mobility**

The Federal Circuit confirmed in both *Whitewater* and *Roche* that an essential threshold question under § 16600 is whether there is "evidence of a restraining effect on [a former employee's] ability to engage in his profession." *Whitewater*, 2020 U.S. App. LEXIS 36394, *26 (quoting *Roche*, 583 F.3d at 837). Demaray does not argue that there has been a restraining effect on Dr. Demaray or any other former employee's ability to engage in his profession—because there is none. The Federal Circuit's reasoning in *Roche* is instructive: "Stanford provides no evidence that the [agreement] restrained Holodniy from engaging in any profession. Indeed, the record shows that Holodniy freely continued his [] research at Stanford: publishing articles and using the knowledge he obtained from Cetus to further the science behind the patents-in-suit." *Roche*, 583 F.3d at 845. The Federal Circuit in *Whitewater* approved of this reasoning in *Roche* and distinguished the facts before it, finding that enforcement of the assignment in that case prevented the former employee from being able to pursue a similar line of work for his subsequent employer. *See* 2020 U.S. App. LEXIS 36394, *15, 26 ("That ground, essentially a threshold ground for application of § 16600, readily distinguishes the present case.").

Here similar to *Roche*, and distinct from the facts in *Whitewater*, the record is devoid of any plausible restraining effect on any of the former Applied or Applied Komatsu employees who joined Symmorphix. To the contrary, once they joined Symmorphix, Applied Komatsu provided systems, facilities, and lab space to Symmorphix for it, and the former employees, to continue developing technology they had been working on at Applied and Applied Komatsu. For example, Dr. Demaray freely continued his research at Symmorphix, publishing articles,[9] filing patent applications, and using his knowledge obtained from Applied to further the science behind the Asserted Patents. Through this action, Applied is not seeking in any way to prevent Demaray, Symmorphix, or any former employees from developing technology or engaging in their

---

[9] *See* "Gain flattened, high index contrast planar Er3+-doped waveguide amplifier with an integrated mode size converter" authored, *inter alia,* by the named inventors of the Asserted Patents at http://www.edemaray.com/uploads/3/1/5/1/3151125/ofc_3_20_2002_paper.pdf.

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

profession. Nor is Applied seeking ownership rights—a critical distinction between the facts of this case and those presented in *Whitewater* and *Advanced*. For example, in *Whitewater*, the former employer was seeking ownership rights to the patents. *Whitewater*, 2020 U.S. App. LEXIS 36394, *2. Similarly, in *Advanced*, Applied sought to enjoin former employees from competing with Applied, and requested a judgment assigning full ownership over the patents at issue. *See* No. 7-cv-5248, FAC, Dkt. No. 31.

The context of those cases is critical, and confirms why those courts found in those specific cases that enforcing the provisions resulted in a restraint of trade in violation of § 16600. Here, to the contrary, Applied is not seeking ownership rights to the Asserted Patents or to enjoin anyone from practicing their trade or profession. Regardless of the outcome of this action, Demaray and the named inventors are free to continue practicing the inventions and to continue researching and developing in the technology space. For the assignment-based claim, Applied is *only* seeking a declaration that it does not infringe the Asserted Patents by reason of the assignment agreements. Thus, there is no evidence of a restraining effect under § 16600.

### 2. *Roche* Confirmed that an Assignment Provision that, as Drafted, Could Reach Post-Termination Inventions Is Not Invalid as to Pre-Termination Inventions

The Federal Circuit in *Whitewater* cites positively to *Advanced* and reached the same ultimate conclusion: assignments of inventions conceived after termination without the use of the employer's confidential or trade secret information are void under § 16600. *See Whitewater* at *23. However, *Advanced* went one step too far in holding the entire assignment provisions of the employment agreements at issue in that case invalid under § 16600 because it touched on post-termination inventions. *See Advanced*, 630 F. Supp. 2d at 1091 ("Since the Court finds that the Assignment Clause touches post-employment inventions, regardless of when they were conceived or whether they were based on Applied's confidential information, the Clause necessarily operates as a restriction on employee mobility.")

The Federal Circuit in *Roche*, decided after *Advanced*, rejected this reasoning. There, the assignment provision reached both pre- and post-termination inventions; and Stanford argued, analogous to the reasoning in *Advanced*, that since the assignment clause touched on post-

APPLIED'S OPPOSITION TO
DEMARAY'S MOTION TO DISMISS

termination inventions it was overly broad and therefore the entire provision should be void under §16600, including inventions conceived before termination or using the employer's confidential or trade secret information. The Federal Circuit rejected this argument. *See Roche*, 583 F.3d at 845 ("Stanford argues that section 16600 voids the VCA because Holodniy conceived the patented invention after departing Cetus, and the VCA violates public policy if it encompasses inventions conceived after employment terminates. . . . We find no merit in Stanford's arguments."); *see also Bd. of Trs. v. Roche Molecular Sys.*, 487 F. Supp. 2d 1099, 1116–17 (N.D. Cal. 2007) ("In any case, the assignment clause at issue would only function as a non-compete provision if it required Holodniy to assign an invention conceived after he left Cetus. In other words, if the patented invention was conceived while Holodniy was still working at Cetus, the VCA is enforceable with respect to Holodniy's interest in that invention . . . . Because the invention was conceived during Holodniy's consultancy at Cetus, the court need not reach the issue of the enforceability of the VCA to inventions conceived after Holodniy left Cetus.").

Thus, in *Roche*, both the district court and the Federal Circuit declined to invalidate the *entire* assignment provision simply because it *could* touch on post-termination inventions—and made clear that such an assignment clause is not invalidated as applied to inventions conceived during employment or using the employer's confidential or trade secret information.

This reasoning is supported by additional precedent in *Armorlite Lens Co. v. Campbell*, 340 F. Supp. 273, 275 (S.D. Cal. 1972), which is cited favorably by *Whitewater*, 2020 U.S. App. LEXIS 36394, *22. The *Armorlite* court reviewed an assignment provision that similarly touched both pre- and post-termination inventions. The court ultimately found the assignment invalid to the extent it reached post-termination inventions, however, it still upheld the validity of the same assignment provision as to pre-termination inventions. *See Armorlite*, 340 F. Supp. at 275 ("[T]o the extent that [the assignment clause] attempts to effect ideas and concepts not based upon the plaintiff's confidential information, that Agreement is void and unenforceable. However, based upon the *Winston Research* case, the Agreement is valid and enforceable as it relates to ideas and concepts which were based upon secrets or confidential information of the employer and which were conceived during employment or within one year of termination.").

1   Therefore, to the extent the assignment provisions in this case could potentially be read to

2   touch on inventions conceived post-termination or without using Applied's confidential

3   information, the Court should follow *Roche* and *Armorlite* and enforce the assignment provisions,

4   at a minimum, to include inventions conceived during employment or with Applied's confidential

5   information. Demaray's argument that Applied's employee assignment provision, when it has no

6   restraining effect on former-employees, is still void is far over-reaching. *See* Mot. at 12. Accepting

7   Demaray's argument that *Advanced* applies to any and all similar Applied Employee Assignment

8   provisions would void scores of lawful invention assignments to Applied, including inventions

9   conceived during employment using Applied's confidential information. This cannot be the proper

10  or intended result of the *Advanced* decision, and as such, further demonstrates that Demaray's

11  arguments at the pleading stage should be denied.

12          **3.      There Is an Open Factual Question as to Whether the Named**
                      **Inventors Conceived of the Invention During Employment and with**
13                    **Applied's Confidential Information**

14          The Federal Circuit's holding and reasoning in *Whitewater* supports denying Demaray's

15  motion to dismiss as to Applied's assignment-based non-infringement claims. The *Whitewater*

16  court explicitly limited its decision to cases where the invention was conceived post-termination

17  and without the use of the former employer's trade secrets or confidential information. 2020 U.S.

18  App. LEXIS 36394, *11–12. In this case, there remains at least a factual dispute which will require

19  discovery from Demaray and the other named inventors as to when the inventors conceived of the

20  invention and whether they relied on confidential or trade secret Applied information to do so.

21  **IV.    CONCLUSION**

22          For the foregoing reasons, Demaray's motion to dismiss should be denied.

23

24  DATED: Dec. 7, 2020                              YAR R. CHAIKOVSKY
                                                     PAUL HASTINGS LLP
25

26                                                   By: */s/ Yar R. Chaikovsky*
                                                             YAR R. CHAIKOVSKY
27
                                                     Attorneys for Plaintiff
28                                                   APPLIED MATERIALS